FILED

SEP 2 9 2015

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL D. MICHAEL, as the Administrator
of the ESTATE OF JACK D. MICHAEL, and
JUDITH A. KUHN, as the Administratrix for
the ESTATE OF PAUL F. HENDERSON, et all,

      Plaintiffs,

      v.                          Civil Action No 1:14 cv 00212

THE ESTATE OF ALEX KOVARBASICH,
by and through ALBERT F. MARANO
SHERIFF OF HARRISON COUNTY, as
Administrator for the Estate of Alex
Kovarbasich, and
CONSOLIDATION COAL COMPANY,

      Defendants.

## MEMORANDUM OPINION AND REPORT AND RECOMMENDATION

### I.
### Procedural History

      Pending before the court are two motions:  Plaintiffs' Motion For Leave To Amend

The Complaint to add Leonard Sacchetti ("Sacchetti") as a defendant, filed July 31, 2015,

and Defendant, Consolidation Coal Company's ("CCC") Motion to Strike Plaintiffs' Motion

to Amend the Complaint or, Alternatively, the Affidavit and other Testimony of Lawrence

Leroy Layne, filed August 12, 2015 (Docket Entries 64 and 68, respectively).

      Both motions were referred to the undersigned Magistrate Judge (Court) by Order

dated August 13, 2015 (Docket No. 69).

      CCC filed its Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend

the Complaint on August 12, 2015  (Docket No. 67).

The administrator of the estate of Kovarbasich ("Kovarbasich") filed his Memorandum In Opposition to Plaintiffs' Motion for Leave to Amend the Complaint on August 14, 2015 (Docket No. 70).

Plaintiffs filed a Reply to Defendant Consolidation Coal Company's Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend the Complaint on  August 19, 2015 (Docket No. 71).

The parties were heard during an omnibus motions hearing held September 10, 2015.

By separate Memorandum Opinion and Order  dated September 14, 2015, pursuant to the authority granted under 28 U.S.C. § 636(b)(1)(A),  the Court decided CCC's Motion to Strike the Affidavit and Other Testimony of Lawrence Leroy Layne (Docket No. 68) filed August 12, 2015  and merged the remainder of the relief sought by Docket No. 68, to-wit: Motion to Strike Plaintiffs' Motion to Amend the Complaint into Defendants' responses to Plaintiffs' Motion for Leave to Amend the Complaint (Docket No. 64).  This Memorandum Opinion and Report and Recommendation addresses Plaintiffs' Motion to Amend (Docket No. 64), Defendants' responses thereto as included in Docket Nos. 67 and 70,  and the remaining and undecided relief Defendants' seek in Docket No. 68.

Because  any ruling on  Plaintiffs' Motion for Leave to Amend the Complaint to add Leonard Sacchetti as a defendant (Docket No. 64) filed July 31, 2015 and the merged and undecided portion of Defendants' motion,  could be dispositive of Plaintiffs' claims as to

Sacchetti, the Court addresses those matters pursuant to the authority granted under 28 U.S.C. § 636(b)(1)(B) and (C).

The motions are now ripe for consideration.

## II.
## Background Factual Information

Seventy-eight (78) coal miners died when the Consol No. 9 mine located near Farmington, Marion County, West Virginia, exploded and caught fire on November 20, 1968.

Prior to the explosion and fire, methane gas concentration in the mine from the mining operations was controlled by four (4) large surface ventilating fans. The No. 1 fan was located at the Slope. The No. 2 fan was located at Athas Run near the 2 North area of the mine. The No. 3 fan was located at Mod's Run near the 4 North area of the mine. The No. 4 fan was located at Llewellyn near the 7 South area of the mine. The fans were monitored by the "FEMCO Supervisory Control" (FEMCO) safety alarm system. The FEMCO system was designed to set off a red light and audible alarm in the lamp house signaling that the fan it monitored had slowed down or stopped. This triggered notification of the miners underground. If the fan remained down for more than twelve minutes, electricity to the mine was shut down.

Following the mine explosion and fire, investigations were conducted over the next

twenty-two (22) years.

September 15, 1970, Mine Safety and Health Administration mine inspector Larry L.

Layne ("Layne") wrote and filed a report in which he stated:

> On September 5, 1970, 12am-8am shift, the Mods Run substation was energized for the first time since the explosion of November 20, 1968. The electrician (name withheld by request) reported that while energizing the substation he found evidence to indicate that the FEMCO fan alarm system for Mod's Run fan had been rendered inoperable prior to the explosion. The fan alarm system had been bridged with jumper wires; therefore, when the fan would stop or slow down, there was no way of anyone knowing about it because the alarm system was bypassed. . . .

A United States Department of Labor Mine Safety and Health Administration

("MSHA") investigation report, rendered in 1990, stated in pertinent part:

> . . . [t]he ventilation along the Main West headings was inadequate overall, and most probably non-existent in some areas between 1 South and 4 North. On the day before the explosion . . . methane accumulated to about four percent on the right side of the 7 South section for a distance of approximately 1,000 feet out by the working section because of inadequate ventilation and the lack of sufficient ventilation controls . . . and the FEMCO Supervisory Control (fan monitoring and mine power cutoff system) was not operating properly at the time the explosion occurred, as mining operations continued at the face after the explosion. (Docket No. 64-1, pp. 37 and 38.)

It also reported: "... only one fan was down and that the monitoring system on the

other fan was blocked out, but the fan was actually operating." (Docket No. 67, p. 3.)

Plaintiffs filed their original complaint against the estate of Kovarbasich by and

through Albert F. Marano, Sheriff of Harrison County, as administrator for the estate of

Kovarbasich[1], and CCC in the Circuit Court of Marion County, West Virginia, alleging therein: 1) because Plaintiffs did not discover, until June 9, 2014, that Kovarbasich, an employee of CCC or its subsidiary, allegedly rendered the FEMCO alarm system related to the Mod's Run fan inoperable before the explosion and, thereafter failed to disclose the same to Plaintiffs or the investigators, Plaintiffs are not time barred from maintaining the action; 2) that all of the beneficiaries of the estates of the seventy-eight (78) deceased coal miners are entitled to class-action status as Plaintiffs; and 3) based on the alleged fraudulent concealment and alleged resulting deprivation of rights to sue, Plaintiffs are entitled to wrongful death damages in the amount of $110,000.00 per class member for the wrongful death of each deceased coal miner in accord with West Virginia Code, Chapter 55, Article 7, Section 6 (1967), pre-judgment and post judgment interest on their award, and punitive damages (Docket No. 1-19).

On December 11, 2014, Defendant CCC removed the case to federal court (Docket No. 1).

On December 23, 2014, Plaintiffs moved for remand to state court (Docket No. 8). The motion for remand is fully briefed but remains pending awaiting the outcome of the appeal to the Circuit Court of Harrison County of the Harrison County Commission's decision upholding the appointment of Harrison County Sheriff as administrator of the estate of Kovarbasich.

---

[1] The legal propriety of the appointment of Marano, Sheriff of Harrison County, as Administrator of the Estate of Kovarbasich, is disputed and pending appeal.

On February 9, 2015, Plaintiffs sought to take the deposition of Sacchetti in order to preserve his testimony (Docket No. 22). Plaintiffs represented to the Court that they believed Sacchetti would identify Kovarbasich as the electrician who "jumped" the FEMCO safety alarm system at Mod's Run prior to the explosion and fire (Docket No. 22, p. 2, pp. 4)(Docket No. 30, p. 12, ln.9-12, p. 13, ln. 10-14) .

On February 11, 2015, the District Judge held a hearing on the motion to preserve Sacchetti's testimony and by summary order granted the same (Docket No 25).

On March 10, 2015, Plaintiffs filed a motion for a reasonable limited deposition time for the Sacchetti deposition (Docket No. 35). The motion was referred to the Magistrate Judge (Court) and a hearing was promptly scheduled for March 13, 2015.

On March 16, 2015, the Court established reasonable deposition time limits (Docket No. 45).

On March 26, 2015, Sacchetti's deposition was taken pursuant to the Court's limiting order dated March 16, 2015 (Docket No. 45). Sacchetti did not identify Kovarbasich as the person who allegedly jumped the wiring on the FEMCO system at Mod's Run.

On April 3, 2015, five (5) lawyers for Plaintiffs met with Layne in his Alabama home.

On April 6, 2015, Plaintiffs sought an order permitting them to preserve the testimony of Layne by taking an expedited deposition. (Docket No. 51). A hearing was held on that motion on April 8, 2015. By order dated April 10, 2015 (Docket No. 57) the Court denied Plaintiffs' the expedited taking of Layne's deposition. The Court instead permitted serving

Layne with a subpoena *ad testificandum* for a day certain more than one-hundred, eighty (180) days after April 10, 2015. The Court also granted Defendants the opportunity to engage in specific and limited discovery during the intervening one-hundred, eighty (180) days in anticipation of the taking of Layne's deposition.

On April 30, 2015, Plaintiffs secured the affidavit of Layne. Layne, a former federal mine inspector and employee of MSHA, retired in 1992. He avers, in his capacity as a mine inspector, he authored a September 15, 1970, memorandum in which he says an unnamed electrician told him that while re-energizing the substation controlling the Mod's Run fan he (the electrician) found evidence to indicate that the FEMCO fan alarm system had been rendered inoperable before the explosion by bridging the alarm system with jumper wires. Layne further avers he withheld the electrician's name on request by the electrician. Layne goes on to aver the electrician was Sacchetti. Layne also, for the first time, now avers that Sacchetti told him in 1970 that Sacchetti and Kovarbasich disconnected the FEMCO alarm on the Mod's Run fan before the November 20, 1968 explosion and it was Layne's understanding it was done with the knowledge of CCC. Layne admits in his affidavit that, "[p]rior to April 3, 2015, I never told anyone that Mr. Sacchetti told me on September 15, 1970, that he and Kovarbasich disconnected the FEMCO alarm on the Mod's Run fan before the November 20, 1968, explosion." (Docket No. 64-7, p. 2, pp. 9.)

The pending motion to amend the complaint seeks to join Sacchetti as a defendant "and that this action should thereafter be remanded to the Circuit Court of Marion County,

West Virginia." (Docket No. 64, p. 1-2.)  Granting of the motion would render waiting on the Circuit Court of Harrison County's decision on the propriety of the appointment of the Sheriff as administrator of the estate of Kovarbasich moot because Sacchetti would become the  diversity destroying Defendant

At the omnibus motion hearing the parties agreed the following facts were undisputed. Therefore,  the Court adopts them.

1.    Explosions and fires occurred within the No. 9 mine on November 20, 1968.

2.    78 miners were killed.

3.    Fans were used to exhaust methane gas from the mine.

4.    FEMCO alarm system was designed to alert when a fan slowed or stopped exhausting gas from the mine section served by the fan.

5.    Federal and State authorities conducted investigation into the explosion and fire.

6.    The investigations extended from 1968 to 1990 when a report was issued.

7.    Lawrence Leroy Layne (Layne) was a federal mine inspector with the Bureau of Mines at the No. 9 mine in 1970.

8.    Attempt was made to re-energize the Mod's Run electric substation in 1970

9.    Layne wrote a memo dated September 15, 1970, in which he said:

   a.    An electrician told him (Layne) that he observed evidence that the FEMCO alarm system had been jumped rendering it inoperable.

   b.    Layne withheld the name of the electrician at the electrician's request.

   c.    Layne's memorandum was part of the Bureau of Mines (MSHA) record.

10. Three civil actions were previously prosecuted as a result of the 1968 mine fire and explosion.

11. Plaintiffs commenced this civil action in 2014

12. March 2015 Sacchetti gives deposition testimony but is not asked by counsel for Plaintiffs if he had anything to do with disabling the FEMCO alarm system at MOD's Run.

13. April 30, 2015 Layne signs an affidavit in which he says:

   a. He was told by Sacchetti in 1970 that Sacchetti and Kovarbasich jumped the FEMCO alarm system at MOD's Run prior to the explosions and fires.

   b. It was his (Layne's) understanding that CCC knew that the fan was by-passed (jumped) prior to the 1968 explosions and fires.

   c. Layne withheld the information he avers he was told by Sacchetti in 1970 until his meeting with five (5) of Plaintiffs; lawyers on April 3, 2015.

III.
Contentions of the Parties

Plaintiffs:

1. Plaintiffs should be granted leave to amend their complaint pursuant to F.R.Civ. P. 15(a)(2) and add Sacchetti, a West Virginia resident, as a defendant in order to test their claims against Sacchetti on the merits.

2. Plaintiffs were not dilatory in bringing this motion because they "first learned that Leonard Sacchetti participated in bridging the Mod's Run fan prior to the November 20, 1968 explosion at Farmington No. 9 mine" on April 3, 2015.

3. Upon granting amendment, remand to the Circuit Court of Marion County, West

Virginia is proper because complete diversity no longer exists.

<u>Defendant CCC:</u>

1.    The motion should be denied because the proposed amendments to assert claims against Sacchetti would be futile.

    a.    The claims against Sacchetti are futile because they are barred by a two-year statute of limitations.

    b.    The discovery rule is inapplicable to a wrongful death cause of action.

    c.    Even applying the discovery rule, the claims against Sacchetti are untimely and, thus, futile.

    d.    Plaintiffs are not entitled to tolling of the two-year statute of limitations period based on alleged fraudulent concealment.

2.    Plaintiffs' proposed amendments do not meet the heightened pleading requirements of Rule 9(b).

3.    Plaintiffs' proposed claims against Sacchetti are barred by the immunity afforded by the West Virginia Workers' Compensation Act.

4.    Plaintiffs' post-removal motion to add Sacchetti as a non-diverse defendant is inappropriate under 28 U.S.C. Section 1447(c).

IV.
<u>Discussion</u>

Role of Syllabus Points and Per Curiam Opinions

    In <u>Walker v. Doe</u>, 210 W.Va. 490, 558 S.E.2d 290 (2001), Justice Albright, speaking

10

for the majority, held in Syllabus Point 2 - "This Court will use signed opinions when new points of law are announced and those points will be articulated through syllabus points as required by our state constitution"; in Syllabus Point 3 - "Per curiam opinions have precedential value as an application of settled principles of law to facts necessarily differing from those at issue in sited opinions. The value of a per curiam opinion arises in part from the guidance such decisions can provide to the lower courts regarding the proper application of the syllabus points of law relied upon to reach decisions in those cases"; and in Syllabus Point 4 - "A per curiam opinion may be cited as support for a legal argument."

A.    F.R.Civ.P. 15(a)

F.R.Civ.P. 15(a)(2) provides the following: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

> Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. See generally, 3 Moore, Federal Practice (2nd 4d. 1948), 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules. Foman v. Davis, 371 U.S. 178, 83 S.C. 227, 9 L.Ed.2d 222 (1962).

"Discretion to deny leave to amend is limited by the principle, embodied in Rule 15(a), that 'leave shall be freely given when justice so requires,' _Id._, and by the general policy embodied in the Federal Rules favoring resolution of cases on their merits. See Fed.R.Civ.P. 1. A court may not then use its discretion either arbitrarily, or in a way that undermines the basic policy of the rule." <u>Davis v. Piper Aircraft Corp.</u>, 615 F.2d 606, 613 (4th Cir. 1980).

In the instant action, Plaintiffs seek to amend their complaint to join Sacchetti as a Defendant. Plaintiffs assert the same basic claims in the proposed amended complaint joining Sacchetti that they alleged against Kovarbasich in their original complaint. Plaintiffs allege that Sacchetti, like Kovarbasich, was an employee (electrician) of CCC. Plaintiffs allege Sacchetti and Kovarbasich rendered the FEMCO warning system for the Mod's Run fan inoperable. Plaintiffs allege they first learned, on April 3, 2015, from Layne that Sacchetti was involved with Kovarbasich in rendering the FEMCO warning system for the Mod's Run fan inoperable before the No. 9 explosion and fire.

Therefore, in the absence of a finding of prejudice, bad faith, or futility, the Court must grant the amendment sought by Plaintiffs. <u>Laber v. Harvey</u>, 438 F.3d 404 (4th Cir. 2006).

There is no evidence or argument that has been made related to either prejudice or bad faith.

B.      Futility

"The burden is on the party opposing the amendment to show prejudice, bad faith, undue delay, or futility." In The Matter Of San Pedro Forklift, Respondent, 2010 WL 3324918 (4th Cir. 2010), Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999).

"Asserting an amendment is futile challenges the legal sufficiency of the amendment. Courts have treated the futility of amendment factor to mean that the amendment would not withstand a motion to dismiss. Id., Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995). In other words, the facts pled, must be "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007). "The Court "must accept as true all of the factual allegations contained in the complaint,'" Id. at 572, "and must 'draw [] all reasonable...inferences from those facts in the plaintiff's favor." Edwards, _supra_ at 244.

1.      Plaintiffs' Wrongful Death Claims

 Plaintiffs' complaint and amended  complaint assert wrongful death claims in both their complaint and amended complaint under West Virginia Code, Chapter 55, Article 7, Section 5 (1967).

West Virginia Code, Chapter 55, Article 7, Section 5, action for death by wrongful act, in effect now and when the No. 9 mine disaster occurred, provides:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person

inured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter. No action, however, shall be maintained by the personal representative of any person who, not an infant, after injury, has compromised for such injury and accepted satisfaction therefor previous to his death. Any right of action which may hereafter accrue by reason of such injury done to the person of another shall survive the death of the wrongdoer, and may be enforced against the executor or administrator, either by reviving against such personal representative a suit which may have been brought against the wrongdoer himself in his lifetime, or by bringing an original suit against his personal representative after his death, whether or not the death of the wrongdoer occurred before or after the death of the injured party.

West Virginia Code, Chapter 55, Article 7, Section 6, generally provides, and has provided, wrongful death damages such as: "(A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses" to the survivors of a decedent through his or her duly appointed personal representative.

If not barred by the statute's limitation of actions provision, Plaintiffs' amended complaint state valid wrongful death claims against Sacchetti under West Virginia Code, Chapter 55, Article 7, Section 5.

CCC contends the wrongful death claims raised by Plaintiffs in their amended complaint are barred by the statute of limitations in effect at the time of the 1968 mine explosion and fire and, therefore, amendment of the complaint to join Sacchetti is futile and

should be denied.

Plaintiffs contend that the Court should apply the statute of limitations law in effect at the time the action was filed (2014) and not when the right of action originally accrued (1968). They further contend any running of the statute of limitations on the wrongful death claims should be tolled by alleged fraud and concealment of Defendants.

Subsection (d) of West Virginia Code, Chapter 55, Article 7, Section 6, 1931, in effect now and since 1989 provides: "Every such action shall be commenced within two years after the death of such deceased person, subject to the provisions of section eighteen, Article two, Chapter fifty-five. The provisions of this section shall not apply to actions brought for the death of any person occurring prior to the first day of July, one thousand nine hundred eighty-eight." Accordingly, it must be concluded from the expressed statutory language that the 1989 provision is and was not applicable to actions arising prior to July 1, 1988.

Between 1967 and 1976, West Virginia Code, Chapter 55, Article 7, Section 6, provided: "Every such action shall be commenced within two years after the death of such deceased person."

Between 1863 and 1980, the West Virginia Supreme Court of Appeals was seldom called on to interpret the language of the statute. However, several cases were decided which are instructive as to the court's view of the language of West Virginia Code, Chapter 55, Article 7, Section 6.

In Lambert v. Ensign Manufacturing Co., 42 W.Va. 813, 26 S.E. 431, 432 (1896), the

court considered whether the limitation of action portion of the statute was properly asserted by the defendant's demurrer to plaintiff's declaration under common law pleading practice. Lambert sued Ensign for the alleged negligent death of a fourteen (14) year old employee who fell in to the belt which ran his machine while working for defendant as a nut capper on November 16, 1892. The suit (declaration) alleged the nut cutting machine was maintained in a defective and dangerous condition. The suit was commenced on January 24, 1895. Defendant demurred asserting plaintiff's claim was not sustainable at law. Essentially, defendant was contending that Plaintiff's claim was barred by the applicable wrongful death statute two-year statute of limitations. The trial court overruled the demurrer. The case proceeded to trial. The jury awarded $5,000.00. On motion of defendant, the verdict was set aside and a new trial awarded. Defendant appealed. The West Virginia Supreme Court of Appeals affirmed the circuit court's granting of a new trial because of its improper denial of defendant's demurrer. In so doing, pertinent to the issue before the magistrate judge in the instant case, the court reasoned: "But here the cause of action did not exist at common law, but is created by statute. The bringing of the suit within two years from the death of the person whose death has been caused by wrongful act is made an essential element of the right to sue, and it must be accepted in all respects as the statute gives it. And it is made absolute, without saving or qualification of any kind whatever. There is no opening for explanation or excuse. Therefore, strictly speaking, it is not a statute of limitation."

A few years later, in <u>Hoover's ADM'X v. Chesapeake & O. RY. Co.</u>, 46 W.Va. 268,

33 S.E. 224, 225 (1899), the court, in reversing the circuit court's grant of judgment against

the plaintiff on defendant's demurrer asserting that plaintiff's wrongful death action for a

death more that a year after defendant's negligence was barred by the one-year statute of

limitations then applicable to negligence actions, reasoned:

> "The statute makes no reference, either impliedly or otherwise, to the bar of
> the statute of limitations prior to the death of the injured person. His condition,
> mental or physical, or obstructions by the wrongdoer, might prevent his
> bringing the suit within the year, and yet the fact that he survived for more than
> a year is claimed to bar the suit of the plaintiff. There is no such provision in
> the statute."

In <u>Rosier v. Garron, Inc.</u>, 156 W.Va. 861, 866-867 (1973), the court addressed the

issue of whether the tolling language in West Virginia Code, Chapter 55, Article 2, Section

18, applies to the wrongful death statute. The court noted that the issue was controlled by

<u>Smith v. Eureka Pipe Line Co.</u>, 122 W.Va. 277 (1940), which held:

> [T]hat the saving provision of Code 55-2-18 does not apply to actions for
> wrongful death. In the Smith case the Court reasoned that the two year
> limitation upon the bringing of an action for wrongful death is an integral part
> of the statute itself and creates a condition precedent to the bringing of an
> action which bears no relationship to statutes of limitation and contains no
> language that would justify a joint construction with the statutes of limitation.
> The Court in Smith traced the origin of the saving provision to the revised
> Code of Virginia of 1819, which contained a substantially similar provision as
> that contained in the Virginia Code of 1849. The provisions of this section
> have remained in effect in West Virginia from the State's inception until the
> present time. As there were no enactments in the United States creating the
> right of recovery for death by wrongful act until after the British Parliament
> passed Lord Campbell's Act in 1846, the Court in Smith reasoned that it is
> obvious that the savings section at the time of the original enactment could not
> have been intended to include proceedings for death by wrongful act, as in
> 1819 there was no cause of action for wrongful death. The two years limitation
> on the bringing of an action for wrongful death is an integral part of the cause

of action, and statutes in derogation of common law will be strictly construed.

This Court, therefore, holds that the circuit court did not err in holding that the provisions of Chapter 55, Article 2, Section 18 of the Code of West Virginia, 1931, do not apply to an action for wrongful death brought under Chapter 55, Article 7, Section 5 and Section 6 of the Code of West Virginia, 1931, as amended.

In Huggins v. Hospital Board Of Monongalia County 165 W.Va. 557 (1980), the West Virginia Supreme Court of Appeal sustained the circuit court's dismissal of the action for wrongful death that occurred on August 3, 1976 for the failure to issue process until more than two years after the date of the death. Diana Huggins died on August 3, 1974. On August 3, 1976, plaintiff's attorney filed suit against the hospital board. He arrived at the clerks office to file the suit near to closing time. The complaint was filed on August 3, 1976, but the summonses were not issued until August 9. The issue on appeal was: "Where the summons and complaint are timely filed within the two-year statute of limitation period, is such period of limitation tolled so as to preserve the cause of action, even though issuance of process is delayed for several days for reasons not within the control of the plaintiff or his counsel." _Id_. at 560. Pertinent to the issue before this Court is the following:

This Court has reasoned that the two year limitation upon the bringing of an action for wrongful death is an integral part of the statute itself and creates a condition precedent to the bringing of an action. This condition is made absolute and, strictly speaking, is not a statute of limitations. The time fixed by the statute creating the right is one of the components entering into the plaintiff's right of recovery. Once the statutory period expires, there remains no foundation for judicial action. In a preceding which is barred by the statute of limitations, however, the basis for relief continues, but the use of the means of enforcing it may be barred if the lapse of time is affirmatively asserted for that purpose.

The <u>Huggins</u> court also found support for its position in its prior ruling in <u>Smith v.</u> <u>Eureka Pipe Line Co.</u>, *supra*. Smith died June 4, 1935, as a result of an explosion of an oil and gas drum stored in a barn under Eureka Pipe Line Company's direction. Plaintiff filed suit for wrongful death on June 6, 1938, three years and six days after Smith's death. The trial court overruled defendant's demurrer applying a savings provision in West Virginia Code, Chapter 55, Article 2, Section 8, which permitted actions "commenced within due time and abated or dismissed involuntarily to be re-instituted within one year" thereby extending the plaintiff's right of recovery for one year from the date of the dismissal. Pertinent to the discussion in the instant case, Judge Kenna wrote:

> Although there is some conflict of authority as to whether the time fixed in a statute creating a right of recovery for death by wrongful act within which the action shall commence is a statute of limitation or whether the fixed time is one of the essential elements, the existence of which constitutes plaintiff's right of recovery, the plain preponderance of decided cases favors the doctrine that the time fixed by the statue creating the right is one of the components entering into the plaintiff's right of recovery. It is conceded that the holdings of this Court place West Virginia among the jurisdictions adhering to the latter doctrine, and that reference to the following cases sufficiently demonstrates this classification. (internal citations omitted).

From the foregoing analysis, this Court concludes, as a matter of law that, at the time of the 1968 Farmington No. 9 mine explosion and fire and for many years thereafter (at least until after 1980), the substantive law of West Virginia was:

> ". . . the two year limitation upon the bringing of an action for wrongful death is an integral part of the statute itself and creates a condition precedent to the bringing of an action. This condition is made absolute and, strictly speaking, is not a statute of limitations. The time fixed by the statute creating the right

is one of the components entering into the plaintiff's right of recovery." "Once the statutory period expires, there remains no foundation for judicial action. In a preceding which is barred by the statute of limitations, however, the basis for relief continues, but the use of the means of enforcing it may be barred if the lapse of time is affirmatively asserted for that purpose."

Notwithstanding Plaintiffs' contentions to the contrary, before and after the 1968 mine explosion and fire, the so-called wrongful death statute of limitations was not subject to being tolled for alleged fraud and concealment. Even though tolling for fraud and concealment was recognized as tolling the negligence statute of limitations and had been applied piecemeal to various types of actions, there is no evidence or case law to support that it was applicable to the wrongful death statute of limitations. *Id*.

For instance, in Hundley v. Martinez, 151 W.Va. 977, 986 (1967), the West Virginia Supreme Court of Appeals, relying on a long list of previously decided cases[2], held in a

---

[2]Baker v. Hendrix, 126 W.Va. 37 (1943) holding "In an action on alleged wrongful and intentional failure of a physician to remove a sponge or gauze which he inserted in a patient's abdomen during the course of an operation, the one-year period of limitation provided by Code, 1931, 55-2-12, as amended, was suspended during such time as the Defendant by fraud or other indirect ways or means obstructed the prosecution of the plaintiff's right of action. In such action a special replication to the plea of the statute of limitations, which alleges plaintiff's lack of knowledge and means thereof, of defendant's intentional wrongdoing, as well as defendant's intentional and deliberate fraud whereby he actively concealed from plaintiff the presence of said sponge or gauze in her body, though diligent inquiry of Defendant was made by plaintiff during all of the period from the time said sponge or gauze was left in plaintiff's body until she first learned or had means of learning of its presence therein, sufficiently alleges an obstruction to plaintiff of her right of action within the meaning of Code, 55-2-17, and is sufficient on demurrer, where, from the writ, made a part of the record by oyer, it appears that plaintiff instituted her action within one year from the time she first learned of or had the means of learning of defendant's alleged wrongdoing." Gray v. Wright, 142 W.Va. 490 (1957) "In an action based upon an alleged wrondoing and intentional failure of a physician to remove a hemostat, which he inserted in plaintiff's abdomen during the course of an operation, the one-year period of limitation provided by Code, 55-2-12, will serve to bar the action, unless the statute is tolled or suspended during such time as the Defendant with knowledge and by fraud, concealment or other indirect ways or means obstructed plaintiff's right of action."
Morgan v. Grace Hospital, 149 W.Va. 783 (1965), "[T]he statute of limitations did not commence to run against cause of action until patient learned of, or by exercise of reasonable diligence should have learned of, the presence of sponge in her abdomen."

medical malpractice personal injury action: "In the event of such fraudulent concealment by a physician, the statute of limitations begins to run when the fraud is penetrated and the injury is discovered or when, by the exercise of reasonable diligence, it should have been discovered. This is commonly referred to the 'discovery rule.'"

Based on the foregoing analysis, this Court concludes that Plaintiffs' motion to amend their complaint to assert West Virginia Code, Chapter 55, Article 7, Section 5, statutory wrongful death claims against Sacchetti is futile. It has been over forty-six (46) years since the deaths of the seventy-eight (78) miners in the Farmington No. 9 mine explosion and fire and no action was brought against Sacchetti within the two-year period provided by West Virginia Code, Chapter 55, Article 7, Section 6. As such, "one of the essential elements, the existence of which constitutes plaintiff's right of recovery. . ." is gone.

2.     Fraud and Concealment as a Stand Alone Cause of Action

In Plaintiff's original complaint brought against Defendants CCC and Kovarbasich, Plaintiff alleged that Kovarbasich jumped the FEMCO alarm system at Mod's Run which prevented the miners from becoming aware of the methane gas buildup and ultimately led to their deaths in the explosion and fires (Docket No. 1, Ex. 19). Plaintiffs further alleged that Defendants concealed this knowledge from Plaintiffs, stating:

> Defendants deliberately and intentionally misrepresented, omitted, concealed and/or failed to disclose material facts to the plaintiffs and regulatory mining agencies. Such misrepresentations, omissions, and concealments of facts include, but are not limited to:
>
> a.     Failing to disclose, omitting, and/or intentionally concealing that Alex Kovarbasich disabled the FEMCO alarm system for the Mod's Run fan

21

at the Consol No. 9 Mine before the November 20, 1968, explosion; and

b. Concealing and/or providing half-truths regarding the causes of the November 29, 1968, explosion.

(Docket No. 1, Ex. 19). Plaintiff further alleges that Defendants concealed these facts from November 20, 1968, to June 9, 2014, despite a duty to disclose, for the specific purpose of depriving Plaintiffs of the ability to discover the material facts and seek redress (Docket No. 1, Ex. 19). Plaintiffs assert that as a direct result of the misrepresentations and concealment of Kovarbasich's actions, Plaintiffs were unable to fully investigate the cause of the explosion and learn of Defendants "willful, wanton, and reckless conduct," which denied them legal remedies to which they were entitled for Defendants' actions (Docket No. 1, Ex. 19).

In the proposed Amended Complaint, Plaintiffs seek to add Sacchetti as a party to the fraudulent concealment claim (Docket No. 64, Ex.1). Plaintiffs now assert that Sacchetti acted in concert with Kovarbasich in disabling the FEMCO alarm (Docket No. 64, Ex. 1). During oral arguments, Plaintiffs argued that the alleged concealment on Sacchetti's part stems from Sacchetti's request to Layne to leave his name out of public reports as well as Sacchetti's years of silence on the

matter. In essence, Plaintiffs are asserting that Sacchetti had an affirmative duty to publicly disclose his involvement in disabling the FEMCO alarm.[1]

---

[1] It should be noted that Sacchetti's alleged involvement in disabling the FEMCO alarm at Mod's Run is merely an allegation at this point. The Court makes no judgment as to the credibility of the allegation.

As a stand-alone action, fraudulent concealment is a common law tort, recognized by the West Virginia Supreme Court of Appeals, consisting of three elements: (1) concealment of facts by knowledge or the means of knowledge; (2) duty to disclose; and (3) intention to mislead or defraud. Trafalgar House Const., Inc. v. ZMM, Inc., 211 W. Va. 578, 584 (2002). It should be noted at the onset, that "if a plaintiff performs an ['']independent investigation['']
of facts which are ['']easily ascertainable,['']  that plaintiff cannot later complain of detrimentally relying upon fraudulent misrepresentations or concealment by the defendant." Id.

In order to satisfy these elements, a party must conduct an affirmative act of concealment designed specifically to prevent the discovery of the information. Kessel v. Leavitt, 204 W. Va. 95, 128 (1998).[2] To better define "active concealment," the West Virginia Supreme Court of Appeals seems to adopt the definition laid out in the Restatement (Second) of Torts:

> [W]hen the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or *when the defendant frustrates an investigation*. . . . Even a false denial of knowledge or information by one party to a transaction, who is in possession of the facts, may subject him to liability as fully as if he had expressly misstated the facts, if its effect upon the plaintiff is to lead him to believe that the facts do not exist or cannot be discovered.

---

[2] This case is factually dissimilar from the case at bar, dealing with the concealment of a child's identity from a biological parent; never-the-less, it is instructive as to application of fraudulent concealment law in West Virginia. Kessel v. Leavitt, 204 W. Va. 95 (1998).

*Id.* It should be noted that in clarifying the meaning of the Restatement, the West Virginia Supreme Court of Appeals goes on to cite to a definition adopted by the Delaware Supreme Court:

> For plaintiffs to recover damages for fraudulent concealment, plaintiffs must demonstrate that defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry.

*Id.* In essence, in lieu of some affirmative action to conceal, the West Virginia Supreme Court of Appeals has found that fraudulent concealment cannot exist. *Id.*

However, there are some exceptions in which silence alone can constitute fraudulent concealment, but these only exist where an affirmative duty to disclose is placed upon one of the actors. For example, a physician has an affirmative duty to disclose to their patient medical conditions, which they cannot discover through reasonable diligence of their own, and failure to do so would represent a fraudulent concealment. Hundley, *supra* at 977. Furthermore, a vendor has an affirmative duty to disclose defects that cannot be discovered through reasonable diligence and failure to do so constitutes a fraudulent concealment (for example, the seller of a house has a duty to disclose termite damage that is not visible upon a reasonable inspection). Stemple v. Dobson, 184 W. Va. 317, 322 (1990). However, there is no West Virginia jurisprudence or statutory law to suggest that an actor such as Sacchetti had a duty to disclose information without an affirmative legal duty to do so and that failure to do so constitutes an affirmative action to conceal.

Keeping the elements and the 1998 and 2002 jurisprudence surrounding these elements in mind, this Court examines the instant case. As stated, in oral argument, Plaintiffs averred that they wish to add Sacchetti due to his failure to disclose his role in disabling the FEMCO alarm. However, Plaintiffs have claimed no affirmative action from Sacchetti, to wit: nothing to indicate that he took any steps to affirmatively conceal this fact. Further, they have pointed to no case law or statute that indicates that a mine electrician has a duty to disclose information regarding his own misconduct to potential litigants and open himself up to civil liability and possible criminal charges (and the Court's search has turned up no such case or statutory law).

That said, despite his lack of a legal duty, the evidence is that Sacchetti disclosed his role in disabling the FEMCO alarm when he told federal mine inspector Layne in September 1970. Sacchetti simply asked Layne to leave his name out of a report (after he had already disclosed). Layne then chose to comply with this request. If anyone conducted an affirmative act of concealment, it is Layne.

In summation, even using the 1998 -2002 law favorable to the Plaintiffs, when the Court looks to the three elements, as they pertain the instant case: (1) it finds no affirmative act of concealment on Sacchetti's part; (2) it finds no duty to disclose endowed upon Sacchetti by any source of law; and (3) it finds Sacchetti had no intention to mislead or defraud (to the contrary, Sacchetti volunteered the information when talking to Layne in 1970). As such, the Court finds an amendment to the complaint that adds Sacchetti to the

fraudulent concealment claim to be futile on its face. Such an amendment cannot possibly survive so much as a motion to dismiss, as there is absolutely no information to suggest that Sacchetti's actions satisfy one element of fraudulent concealment, much less all three elements.

### 3a.  Deliberate Intent Claims

Plaintiffs also assert statutory and common law causes of action based on the concepts of deliberate intent as outlined in Mandolidis v. Elkins Industries, Inc., 161 W.Va. 695, 246 S.E.2d 907 (1978), which was later superseded by the West Virginia statute (West Virginia Code, Chapter 23, Article 4, Section 2(c)) commonly referred to as the "deliberate intent statute."[3]

West Virginia's Workmen's Compensation Act has contained a deliberate intent exception to the protections afforded employers since its origin. After years of application of a very restrictive interpretation of the deliberate intent exception, the West Virginia Supreme Court of Appeals decided Mandolidis, Id. Mandolidis was decided ten (10) years after the No. 9 mine disaster of 1968.

In Mandolidis, the West Virginia Supreme Court of Appeals held: "Under W.Va. 23-4-2, an employer is subject to a common law tort action for damages or for wrongful death where such employer commits an intentional tort or engages in wilful, wanton, and reckless misconduct, and to the extent that the syllabus point in Allen v. Raleigh-Wyoming Mining

---

[3]The Court does not need to discuss the current deliberate intent statute because it was enacted by the West Virginia Legislature after Mandolidis.

Co., 117 W.Va. 631, 186 S.E. 612 (1936), syllabus point 3 of Brewer v. Appalachian Constructors, Inc., 135 W.Va. 739, 65 S.E.2d 87 (1951), and syllabus point 2 of Eisaugle v. Booth, 226 S.E.2d 259 (W.Va. 1976) are inconsistent therewith, they are hereby expressly disapproved of and overruled."

In so doing, the Mandolidis court construed the deliberate intent exception to employer protection in the West Virginia Workmen's Compensation Act by conducting a historical analysis of selected cases decided by it over the intervening years since passage of the act.

The analysis started with Collins v. Dravo Contracting Co., 114 W.Va. 229, 171 S.E. 757 (1933). Collins, administratix of the estate of James Collins, deceased, brought and action for wrongful death against Dravo Contracting Company. The amended declaration alleged that Collins was involved in construction of locks on the Kanawha River. While working under an overhanging bank, the bank caved in and killed Collins. The declaration alleged the company knew of the probability of the bank caving in and of Collins working under the conditions and that Dravo acted with deliberate intent to injure and kill. The defendant company filed special pleas alleging immunity from suit protection under the Workmen's Compensation Act. The trial court denied Collins' motion to strike the special pleas and the case was sent to the jury. The jury found for defendant on the special pleas. In reversing and remanding, the court held:

> If the Defendant permitted the conditions set forth in the declaration to exist; if they were conditions that would naturally

result in injury or death to its employees, and lent themselves to that purpose; if the Defendant, prior to the happening that resulted in the death of Plaintiff's decedent, knew full well that such conditions existed, then, however difficult the proof may be when it comes to that, as a matter of pleading, we cannot see why the very conditions alleged as matters of fact might not have been permitted to continue with the deliberate intent on the part of the employer and with a design that their continuance should cause injury or death or both to its employees. We do not say that deliberate intent to injure can be inferred from the facts set up in this declaration. We merely hold that the allegations are sufficient to admit evidence, in addition to the facts alleged, to show such intent.

The Mandolidis court next analyzed Maynard v. Island Creek Coal Co., 115 W.Va. 249, 175 S.E. 70 (1934). Maynard, a coal mine employee was killed when he stumbled over a protruding bolt and fell in to an operating conveyor. The conveyor was known by the employer to be repeatedly in disrepair. The bolt was part of a repair and was left sticking up in an area where there was no protection over a tripping hazard. The court in Maynard held:

> The West Virginia Workmen's Compensation Law provides (Code 23-4-2) that an employer, subscriber to the compensation fund, shall not be relieved by the compensation act from liability for damages on account of injury or death of any employee caused by the "deliberate intention" of the employer to produce injury or death of the employee. Allegations in a declaration of acts of gross negligence by the employer do not constitute deliberate intention within the meaning of the said statutory provision. To bring a case within said provision, at the very least, there must be alleged facts from which the natural and probable consequence reasonably to be anticipated would be death or serious injury to the employee affected thereby.

The court distinguished the strength of the Collins declarations against the weakness of the Maynard declarations:

In our opinion, the facts pleaded in the Collins case present a far more aggravated situation than the facts pleaded in the case at bar. . . . The amended declaration therein [Collins] alleged facts from which the natural and probable consequence reasonably to be anticipated was death to the employees who might be put to work beneath the overhanging earth. A kindred situation is not pleaded at bar. The result of the stumbling was characterized by fortuitousness rather than by anticipated sequence.

Next, the court analyzed the cases of <u>Allen v. Raleigh-Wyoming Mining Co.</u>, <u>Brewer v. Appalachian Constructors, Inc.</u>, and <u>Eisaugle v. Booth</u>, *supra*, wherein the court held, from 1936 until disavowed in <u>Mandolidis</u>: the Compensation act provision precluded "any recovery by an employee . . . unless there was a showing of '(a) specific deliberate intent on the part of the latter to produce the injury. . . .'" In disavowing the holdings in <u>Allen</u> and <u>Brewer</u>, the <u>Mandolidis</u> court concluded that the court in <u>Allen</u> and <u>Brewer</u> failed to discuss the legislative purposes that were the underpinning of the worker's compensation legislation. Instead, the <u>Allen</u> and <u>Brewer</u> courts followed judicial interpretations of other states compensation statutes, to wit: "the definition of 'deliberate intent,' as used in their workmen's compensation laws, was arrived at by examining the definition given to such terminology in a murder statute." <u>Mandolidis</u>, *supra* at 913. The <u>Mandolidis</u> court specifically held: "In light of the conditions giving rise to the passage of the Act, and in light of the purposes of the Act, we believe the <u>Collins</u> and <u>Maynard</u> courts correctly interpreted the statute, and the <u>Allen</u> court's interpretation was erroneous and ***cannot continue to represent the law of this state."*** (Emphasis added.)

However, on review of <u>Allen</u>, *supra* at 614, the magistrate judge notes that the <u>Allen</u>

29

court analyzed its prior rulings in <u>Collins</u> and <u>Maynard</u> in light of its interpretation of deliberate intent stating: "It may be that the carelessness, indifference and negligence of an employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury. But in the very nature of things, a showing which would warrant such finding would have to be clear and forceful in high degree. Even in the <u>Collins</u> case, *supra*, notwithstanding the incriminatory and revolting nature of its allegations, we held merely 'that the allegations are sufficient to admit evidence, in addition to the facts alleged, to show such intent.'" In the sole syllabus point of the case, the court held: "Section 2, Article 4, Chapter 23, Code 1931, authorizes an action for damages by an employee against his employer, notwithstanding the Compensation Act, for injury caused by the deliberate intention of the employer to produce the same. Held, that a specific intent on the part of the employer to produce the injury must be shown to support a recovery in such case."[4]

In the <u>Brewer</u> case, the court upheld the demurrers of Christopher Coal Company and

---

[4]Allen was riding on the front end of a trip of empty mine cars inside defendants coal mine when he came in contact with a wooden trapdoor that had been hung across the track the day before. The wooden trap door replaced a canvas barrier that had been in place for some time. Plaintiff denied knowledge of the switch-out of the wooden trap door for the canvas barrier. Defendant an other company employees knew of the switch-out but did not warn the Plaintiff. Plaintiff sued and recovery damages against his employer. On appeal, the West Virginia Supreme Court reviewed <u>Jenkins v. Carman Mfg. Co.</u> 79 Or. 448, 155 P. 703, 705 (1916), for an interpretation of deliberate intent. The Oregon court wrote: "A deliberate act is one the consequences of which are weighed in the mind beforehand. It is prolonged premeditation, and the word when used in connection with an injury to another denotes design and malignity of heart. . . . We think by the words 'deliberate intention to produce the injury' that the lawmakers meant to imply that the employer must have determined to injure an employee and used some means appropriate to that end; that there must be specific intent, and not merely carelessness or negligence, however gross."

Guy Hinerman to Plaintiff's declarations holding in syllabus point 3: "In an action by an employee against an employer, who is a subscriber to the workmen's compensation fund and not in default, for an injury committed with deliberate intent, the allegations of the declaration must allege facts showing, or clearly implying, such intent; negligence, however wanton, does not supply such intent." In the body of the opinion, Judge Given noted that the employers "knowledge of the dangers and the carelessness, negligence and recklessness of the Defendant in not obviating it" when they sent Plaintiff in to the burning building full of explosives to retrieve company tools, was "not sufficient to show deliberate intent to injure or kill."[5]   Borrowing from Collins, the court further stated: "Gross negligence is not tantamount to 'deliberate intention' to inflict injury.   It may be that the carelessness, indifference and negligence of an employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury.   But in the very nature of things, a showing which would warrant such finding would have to be clear and forceful in high degree."

Analysis of other cases from other jurisdictions resulted in the same interpretation of the words "deliberate intent."   Relying on those other state courts interpretation of the same deliberate intent language in their compensation statutes, the Allen court held: "As the

---

[5]Brewer alleged that his employer and foreman sent him inside a gasoline fueled  burning building to retrieve company tools and, when the gasoline fueled fire set off explosives known to be in the building, Plaintiff was injured.  Plaintiff does not allege the overfilling of the gasoline tank by a third party or the resulting fire were caused by Plaintiff's employer or the supervisor who ordered him in to retrieve the tools.

evidence, in our opinion, is not sufficient to establish a deliberate or specific intent on the part of any agent of the employer to cause the injury complained of, the judgment of the circuit court is reversed, the verdict set aside, and a new trial awarded."

This Court has found nothing to indicate that the substantive common law definition of deliberate intent in West Virginia changed from that pronounced in <u>Allen</u> until the West Virginia Supreme Court's 1978 decision in <u>Mandolidis</u>. There is every indication in the expressed language used by the court in <u>Mandolidis</u>, *supra* at 913, to wit: "we believe the <u>Collins</u> and <u>Maynard</u> courts correctly interpreted the statute, and the <u>Allen</u> court's interpretation was erroneous and ***cannot continue to represent the law of this state*** " that (1) the court recognized that <u>Allen</u> had been the law of deliberate intent for the period between <u>Collins, Maynard</u> and <u>Mandolidis</u> and (2) that the ruling in <u>Mandolidis</u> was prospective in its application. (Emphasis added.)

In the absence of the Plaintiffs' deliberate intent claims being barred by the applicable limitations of action statute, this Court cannot find at this juncture of the case that the filing of the proposed amended complaint to allege deliberate intent claims against Sacchetti is futile. At this juncture of the case, there is insufficient evidence to convince this Court that there was any deliberate intention to inflict injury or death on the miners by the alleged disabling of the FEMCO alarm system at Mod's Run.

However, it must be remembered that <u>Allen</u> and <u>Collins</u> were decided in the era of common law pleading which required fact specific declarations. <u>Brewer</u>, *supra.* Since 1960,

West Virginia has had notice pleading under the Rules of Civil Procedure. All that is required under the rules is that the claim for relief contain a short and plain statement of the claim showing that the pleader is entitled to relief. It cannot be known today whether Plaintiffs will be able to provide factual evidence through the discovery process that may convince the Court the Defendants were so careless, so indifferent, so grossly negligent as to warrant a judicial determination that their ulterior intent was to inflict injury and death on the miners. <u>Collins</u>, *supra.* This would ordinarily be decided by the Court on motion for summary judgment or on motion to dismiss following discovery, either unlimited or solely limited to the issue of deliberate intent. In short, the Court would still be bound to apply the substantive West Virginia law in effect in 1968 as it related to deliberate intent, but it would use today's procedure under the rules to govern the process of fact gathering leading up to the substantive law decision.

3b.    Statute of Limitations/Discovery Rule - Deliberate Intent

In 1968 the statute of limitations for bringing an action based on the deliberate intent exception to the Workman's Compensation law was two (2) years.

The West Virginia Supreme Court of Appeals first applied the "discovery rule" to medical negligence cases generally in its 1967 decision of <u>Hundley</u>, *supra*, at 977: "In a medical malpractice case the statute of limitations begins to run at the time the injury is inflicted, or . . . when . . . the injury is discovered or when by the exercise of reasonable diligence it should have been discovered." The West Virginia Supreme Court of Appeals had

earlier applied the "discovery rule""restricted to cases involving foreign objects negligently left in a patients body. <u>Morgan v. Grace Hospital, Inc.</u>, 149 W.Va. 783 (1965).

The West Virginia Supreme Court of Appeals extended the application of the "discovery rule" to legal malpractice (negligence cases in 1974, <u>Family Savings and Loan, Inc. v. Ciccarello</u>, 157 W.Va. 983, 991).

The West Virginia Supreme Court of Appeals construed the medical professional liability act, West Virginia Code, Chapter 55, Article 7B, Section 4 (1986). The court held: "In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury." The court also reaffirmed the long held rule announced in <u>Hill v. Clark</u>, 163 W.Va. 258 (1978), that: "Issue of plaintiff's knowledge or constructive knowledge of defendant's negligence is for jury to determine in medical malpractice action."

In the 1991 decision in <u>Miller v. Romero, M.D.</u>, 186 W.Va. 523, the Court, in another medical negligence case involving a sponge left in Plaintiff's abdomen during surgery, held: "Where, in a civil action for damages against a private hospital and an individual, the plaintiff alleges that, in connection with a surgical operation performed upon her, a surgeon and other persons employed by the defendants negligently failed to remove from the

plaintiff's abdomen a sponge placed therein in connection with the surgical operation, the period of the applicable statute of limitations does not commence to run against the plaintiff's cause of action until she learns of, or by exercise of reasonable diligence should have learned of, the presence of the sponge in her abdomen." The court also held that: "The two-year period which limits the time in which a decedent's representative can file suit is extended only when evidence of fraud, misrepresentation, or concealment of material facts surrounding the death is presented."

The law of West Virginia in 1992 was that "a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or be reasonable diligence should know of his claim"; "the 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application"; and "[m]ere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations; the 'discovery rule' applies only when there is a strong showing by the plaintiff that some action ay the Defendant prevented the plaintiff from knowing of the wrong at the time of the injury." Cart v. Marcum, 188 W.Va. 241 (1992).

In 2001, Bradshaw v. Soulsby, 210 W.Va. 682, the West Virginia Supreme Court of Appeals redefined and expanded the common law of "tolling" of the statutory wrongful death statute of limitations. In Bradshaw, a drug overdose medical negligence and wrongful death action, the court held: that "(1) discovery rule, tolling the statute of limitations until discovery

35

of a claim applies to actions arising under the wrongful death act; overruling <u>Miller v. Romero</u>, 186 W.Va. 523 (1991) AND (2) Statue of limitations began to run on widow's claim when she first discovered that husband's death may have been caused by a wrongful act, rather than when husband died." Within the body of the opinion, the court held: "In a wrongful death action, under the discovery rule, the statute of limitation contained in W.Va.Code, 55-7-6(d) begins to run when the decedent's representative knows or by the exercise of reasonable diligence should know (1) that the decedent has died; (2) that the death was the result of a wrongful act, neglect, or default; (3) the identity of the person or entity who owed the decedent a duty to act with due care and who may have engaged in conduct that breached that duty; and (4) that the wrongful act, neglect or default of that person or entity has a causal relation to the decedent's death." *Supra* 689-690.

<u>Bradshaw</u> was not the substantive law of West Virginia in 1968.

As stated, the Plaintiffs' deliberate intent claim can only survive if the Plaintiffs demonstrate a reason to toll the two-year statute of limitations that was in place in 1968. Plaintiffs claim that the statute of limitations should be tolled under the discovery rule because they were unable to discover the pertinent information - Sacchetti's involvement with disabling the FEMCO alarm - until decades after the fact. However, Layne knew the facts in 1970. Layne wrote the memo in 1970. Layne disclosed the information to an investigative reporter/author writing a book about the No. 9 mine disaster in 2009.[6]

---

[6]The Plaintiffs knew their miners died within days of the 1968 mine explosion and fire. In 2012, Bonnie E. Stewart authored and published a book: <u>No. 9: The 1968 Farmington Mine Disaster.</u> In *Chapter 17: Hidden Evidence*, Stewart writes: "In November 1970, just days before recovery workers found her

36

Notwithstanding that the information was readily available for the asking from Layne, the substantive law in West Virginia in 1968, as the West Virginia Supreme Court of Appeals explained, was: "mere ignorance of the existence of a cause of action or the identity of the wrongdoer does not prevent the running of the statute of limitations." Cart, *supra*, at 245.

This rule is not without exception. As the Miller court explained, a showing of fraud, misrepresentation, or concealment may be used to toll the statute of limitations. Miller, *supra*, 528. Plaintiffs aver that, due to a fraudulent concealment conducted by Sacchetti, they were unable to discover the information needed to bring such a claim; as such, the statute of limitations must be tolled in accordance with the discovery rule. This Court disagrees.

---

husband's body, Ethel McDonald joined 34 other widows in two lawsuits against Consolidation Coal. . . . The odds, however, did not favor the No. 9 widows. . . . Dependents of the dead could do no more than collect the meager payments available through the state fund, with one exception. If someone could prove that an employer had deliberate intention to cause death or injury to an employee, then the person's dependents could sue for any excess damages not covered by the workmen's compensation law. 'Willfully operating an unsafe mine, however, did not meet the 'deliberate intent' stipulation. . . . Their case lingered in court . . . What neither the widows nor their attorney knew was that more than a month before they filed their lawsuits, a federal official had discovered the evidence they needed to win their case.

**The Memo** On September 5, 1970, federal coal mine inspector Larry L. Layne and a recovery crew of nine men were working near the Mods Run air shafts. That day, for the first time since the disaster, they re-energized the Mods Run substation. . . . A few days later, the electrician who had re-energized the substation told Layne that someone had deliberately disabled the Mods Run fan's safety alarm before the disaster. The electrician had found jumper wires bypassing both the fan alarm system and the mechanism that would have automatically shut off power to the entire mine with minutes after the fan stopped or stalled. Immediately, Layne sent a handwritten memo to his federal district supervisor, James D. Micheal, in Morgantown. Michael initialed the memo three days later and wrote at the bottom: 'Copy to W.R.Park, Marshalek' and 'Enter in notes.' . . . When the electrician came to him, Layne said he knew that the chief electrician, a company man, must have rigged up the bypass. A higher -level company manager would have given him orders to do so."

In summary, Stewart, an author, interviewed Larry Layne in Jasper, Alabama, between January 17 - 18, 2009, and gathered much of the information she used in writing Chapter 17 from that interview of Layne.

In order to toll the statute of limitations, regarding the deliberate intent claim, Plaintiffs must show a fraudulent concealment. As this Court has already discussed, fraudulent concealment is not and has not been considered a passive act in West Virginia; rather it is an affirmative action with three elements; (1) concealment; (2) duty to disclose; (3) intent to mislead. Trafalgar, *supra*, at 584; Kessel, *supra*, at 128.

As stated in the foregoing section, there are no facts alleged to suggest that Sacchetti concealed anything. Based on the facts alleged by the Plaintiffs themselves, Sacchetti openly disclosed to Layne, a government investigator, that he had disabled the FEMCO alarm. While this Court accepts, for the purpose of the instant motion, that Sacchetti asked Layne to leave his name out of the report, that request was made after he had already disclosed his role to Layne and it was a request to which Layne simply could have said "no." This Court does not view a simple request, made after the initial disclosure to a government investigator assigned to investigate the disaster, to be an affirmative act of fraud or concealment.

In summation, the Plaintiffs may allege that they did not have knowledge of Sacchetti's role in disabling the FEMCO alarm, but "mere ignorance of . . . the identity of the wrongdoer" is not sufficient to toll the statute of limitations or to invoke the discovery rule. Cart, *supra*, at 245. Further, there are absolutely no facts alleged, even when viewed in the light most favorable to the Plaintiffs, indicate that Sacchetti committed an affirmative act of fraud or concealment. To the contrary, Sacchetti knowingly, actively, and affirmatively cooperated with and disclosed his role to a government investigator, who was investigating

and preparing a report on the mining disaster. While it is true that he requested Layne leave his name out of the report, Sacchetti had neither the influence nor the ability to force Layne to do this or take any sort of affirmative step in furtherance of concealing the information once he had disclosed it to the government's investigator.

There are absolutely no facts, based on those alleged in the light most favorable to the Plaintiffs, to allow for the finder of fact (be it judge or jury) to conclude that Sacchetti fraudulently concealed his identity.

As such, the undersigned this Court finds that the Motion to Amend to add a deliberate intent claim against Sacchetti is futile. The two-year statute of limitations is well past and was not tolled as to claims against Sacchetti.

4.      28 U.S.C. §1447(e)

The statute provides: "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the state court."

Defendants urge this Court to find Plaintiffs' attempt to join Sacchetti is solely for the purpose of escaping federal court. Plaintiffs argue their motive is simply to obtain justice for the Plaintiffs against Sacchetti.

Because of the recommendation made herein based on the substantive law in 1968, this Court does not have reach the issues raised by or use its discretion under §1447.

V.
Recommendation

39

For the reasons stated herein, this Court finds and concludes that Defendants have carried their burden of showing futility of the proposed amendment of Plaintiffs' complaint to add Sacchetti as a defendant. In The Matter of San Pedro Forklift, Respondent, *supra.* The proposed amended complaint raising claims against Sacchetti would not withstand a motion to dismiss based on an asserted statute of limitations defense. Perkins, *supra.*

Accordingly, it is this Court's **RECOMMENDATION** that Plaintiffs' Motion for Leave to Amend the Complaint to add Leonard Sacchetti ("Sacchetti") as a defendant, filed July 31, 2015, (Docket No. 64) be **DENIED.** It is further this Court's **RECOMMENDATION** that the remaining relief requested in Defendant, Consolidation Coal Company's ("CCC") Motion to Strike Plaintiffs' Motion to Amend the Complaint or, Alternatively, the Affidavit and other Testimony of Lawrence Leroy Layne, (Docket No. 68), be **DENIED AS MOOTED BY THIS COURT'S RECOMMENDATION WITH RESPECT TO DOCKET NO. 64.**

Any party may, within fourteen (14) days after being served with a copy of this Memorandum Opinion And Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Memorandum Opinion And Report and Recommendation to which objection is made and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Memorandum Opinion And Report and Recommendation set forth above will result in waiver of the right to appeal from a

judgment of this Court based upon such Memorandum Opinion And Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Memorandum Opinion And Report and Recommendation to all counsel of record.

DATED: September 29, 2015.

JOHN  S. KAULL
UNITED STATES MAGISTRATE JUDGE